## THE UNITED STATES DISTRICT COURT
### DISTRICT OF UTAH

| | |
|---|---|
| **RYAN JENSEN,**<br><br>        **Plaintiff,**<br><br>**vs.**<br><br>**NUCOR CORP., a Delaware Corporation; CHRIS LOCKE, an individual; CODY MCDERMOTT, an individual; ZANE CHECKETTS, an individual, and DOES 1-50,**<br><br>        **Defendants.** | **MEMORANDUM DECISION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>**Case No. 1:21CV100 DAK-JCB**<br><br>**Judge Dale A. Kimball** |

This matter is before the court on Defendants' Motion for Summary Judgment. On February 23, 2023, the court held a hearing on the motion via Zoom videoconferencing.  At the hearing, Laura Malugade and Hillary L. Klein represented Defendants Nucor Corporation, Chis Locke, Cody McDermott, and Zane Checketts (collectively, "Defendants"). Aaron K. Berman and Arther P. Hart represented Plaintiff Ryan Jensen. At the conclusion of the hearing, the court took the motion under advisement. The court has carefully considered the memoranda filed by the parties, the arguments made by counsel at the hearing, and the law and facts pertaining to the motion. Now being fully advised, the court issues the following Memorandum Decision and Order granting Defendants' Motion for Summary Judgment.

### FACTUAL BACKGROUND

In this lawsuit, Plaintiff Ryan Jensen has brought Title VII claims against his employer, Nucor Corporation, for alleged sexual harassment and retaliation for reporting the

harassment.[1] Specifically, Mr. Jensen claims that on March 21, 2020, after he noticed that he had made a mistake at work (loading seven of the wrong billets into a reheat furnace), he radioed the crew, instructing them to hold up because of his error. One of his supervisors, Zane Checketts, called him "Hot Dog," and someone also played the Oscar Mayer Weiner song over the radio.

Plaintiff admits that he had had the nickname "Hot Dog" since approximately 2012. He had previously indicated—in an unrelated grievance in 2019—that this nickname was given to him "because of the fat rolls on the back of my neck." At some point, however, he came to believe that the nickname "Hot Dog" was given to him to suggest that he had a small penis. When asked how he arrived at that conclusion, Plaintiff stated that he had performed a Google search of the question, "Why would someone call me Hot Dog?," and the search result yielded a reference to a small penis. He admits that, prior to the incident at issue in this case, he had never told anyone that he thought "Hot Dog" was a reference to a small penis.

On April 8, 2020, Plaintiff's Supervisor, Jake Montgomery, presented Plaintiff with discipline related to Plaintiff having loaded the wrong billets into the reheat furnace on March 21, 2020. According to Plaintiff, after being presented with the discipline, he told Mr. Montgomery that he "didn't appreciate Zane [Checketts] calling [him] Hot Dog, and [he] didn't

---

[1] Plaintiff concedes that his claim for intentional infliction of emotional distress against the individual defendants and his claim for breach of contract are not cognizable and may be dismissed. *See* Pl's Resp. to Defs.' Mot. for Summ. J., ECF No. 39, at 2. These two causes of action are therefore dismissed.

appreciate the Oscar Mayer Wiener song being played on the radio when [he] was in a mess trying to fix [his] mistake."

Plaintiff then called Wayne Keller, who was Mr. Checketts' boss. Mr. Montgomery was still present and was able to hear at least Plaintiff's side of the conversation. Plaintiff began his conversation with Mr. Keller by attempting to explain the error that he had made on March 21, 2020. Plaintiff proceeded to tell Mr. Keller that Mr. Checketts had made a comment about his penis size over the radio, and Plaintiff asked Mr. Keller, "Why are we talking about my penis?"

After Plaintiff's telephone call with Mr. Keller, Nucor Human Resources Supervisor ("HR Supervisor") Cody McDermott was informed of the allegations. On the same day, he met with Plaintiff and Mr. Montgomery. Mr. Keller told Mr. McDermott that he had talked to Mr. Checketts and that Mr. Checketts had denied the allegation that he had made any comment about Plaintiff's penis size. When Mr. McDermott asked Plaintiff questions about what had happened, Plaintiff responded by saying that he did not want to get Mr. Checketts in trouble, and that he wanted Mr. Keller to handle the situation. When Mr. McDermott continued to ask Plaintiff questions about the incident, he responded by saying, "I don't recall." Plaintiff admits that he refused to participate in the investigation.

Given Plaintiff's unwillingness to share information with the HR Supervisor, and in an effort to obtain more information, Nucor General Manager Chris Locke and Controller Chris Hendricksen met with Plaintiff later that day, April 8, 2020. Plaintiff admits that he refused to answer certain questions when he met with Mr. Locke and Mr. Hendricksen, and Plaintiff did not tell them that Mr. Checketts had commented on his penis size. In the course of the

investigation, Mr. McDermott questioned Mr. Checketts about Plaintiff's allegations. Mr.
Checketts again denied talking about Plaintiff's penis and denied any knowledge of the Oscar
Mayer Wiener song having been played over the radio.

Nucor management interviewed the members of Mr. Checketts' crew, management
asking whether anyone had heard a statement over the radio regarding someone's penis
and/or if they had heard the Oscar Mayer Wiener song played over the radio in the last few
months. Every one of the eleven individuals interviewed denied having heard any comment
about someone's penis. A few of the individuals reported that they had heard the Oscar Mayer
Wiener song played in the past but said they had not heard it recently.

Based on the investigation, Mr. Locke, Mr. Hendricksen, and Mr. McDermott, and Melt
Shop Manager Jamie Wambsganss believed that Plaintiff had made an untrue allegation about
Mr. Checketts by reporting that Mr. Checketts had commented about his penis size over the
radio. Mr. Locke perceived that Plaintiff had a pattern of having difficulty accepting
responsibility for his actions and often attempted to deflect when he was held accountable.
Plaintiff had gone to Mr. Locke on a number of occasions in the past, trying to explain and
justify his past performance issues. Plaintiff admits that every time he sat down with Mr. Locke,
Plaintiff complained about how unfair it was that he had been disciplined for certain things in
the past. Mr. Locke's perception, based on the numerous meetings he had with Plaintiff, his
review of documents related to Plaintiff's employment history, and his conversations with
others (including individuals who had previously served in leadership roles at the facility and a
coach who had been arranged to help Plaintiff learn leadership skills to succeed), was that

Plaintiff failed to follow up when provided with constructive advice and instead reverted to questioning the validity of management's past decisions.

Mr. Locke shared this feedback with Plaintiff during a February 2020 conversation. Mr. Locke repeatedly, including during the February 2020 meeting with Plaintiff, talked with Plaintiff about the need for Plaintiff to look forward rather than backward. Mr. Locke believed that Plaintiff was unwilling or unable to look forward rather than backward, creating negativity and evidencing an attitude that was not conducive to a successful future. Mr. Locke found Plaintiff's behavior and performance in this regard to be unsatisfactory. Due to the seriousness of what management viewed as Plaintiff's false report of sexual harassment, and considering what management viewed as habitual unsatisfactory behavior and performance by Plaintiff, Mr. Locke, in conjunction with Mr. Hendricksen, Mr. McDermott, and Mr. Wambsganss, decided to terminate Plaintiff's employment, effective April 14, 2020.

Mr. Jensen argues that Nucor's stated reason for terminating his employment is not credible on its face and is directly contrary to the facts known by Nucor at the time his employment was terminated. He also contends that Nucor did not promptly or reasonably investigate the matter and never provided Mr. Jensen with an opportunity for curative measures that would have put an end to the sexual harassment.

**LEGAL STANDARD**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  When considering a motion for summary judgment, the court views "all facts

[and evidence] in the light most favorable to the party opposing summary judgment." *S.E.C. v. Smart*, 678 F.3d 850, 856 (10th Cir. 2012) (quoting *Grynberg v. Total S.A.*, 538 F.3d 1336, 1346 (10th Cir. 2008)).  The movant must prove that no genuine issue of material fact exists for trial. *See* Fed. R. Civ. P. 56(a); *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010). Accordingly, to survive summary judgment, "the nonmoving party must come forward with specific facts showing there is a genuine issue for trial." *Smart*, 678 F.3d at 858 (quoting *L & M Enters. v. BEI Sensors & Sys. Co.*, 231 F.3d 1284, 1287 (10th Cir. 2000)).  The nonmovant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Champagne Metals v. Ken–Mac Metals, Inc.*, 458 F.3d 1073, 1084 (10th Cir.2006).  And the "mere existence of a scintilla of evidence in support of the nonmovant's position is insufficient" to create a genuine issue or dispute of material fact. *Sinclair Wyo. Refin'g Co. v. A & B Builders, Ltd.*, 989 F.3d 747, 765 (10th Cir. 2021) (internal quotations and citations omitted). To create a genuine issue, "the nonmovant must present facts upon which a reasonable jury could find in favor of the nonmovant." *Id.* Stated another way, the relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Simpson v. Univ. of Colo. Boulder*, 500 F.3d 1170, 1179 (10th Cir.2007) (internal quotation marks and citation omitted).

**UNDISPUTED FACTS FOR PURPOSES OF SUMMARY JUDGMENT[2]**

1.  On March 21, 2020, Plaintiff made an error at work, loading seven of the wrong

    billets into a reheat furnace. Upon discovering his error, Plaintiff radioed the crew,

    instructing them to "hold up." *See* Depo. of Pl. Ryan Jensen ("Pl.'s Dep."), ECF No. 39-1, Ex.

    1, at 31:3-32:17.

2.  After Plaintiff radioed the crew about the need to "hold up" because of the error,

    Supervisor Zane Checketts got on the radio and called Plaintiff "Hot Dog." *Id.* at 31:3-32:17

    and 35:8-36:22.

3.  After Mr. Checketts called him "Hot Dog," someone on Mr. Checketts' team played the

    Oscar Mayer Wiener song over the radio. *Id.* at 31:3-32:14.

4.  The Oscar Mayer Wiener song is a commercial jingle with the words, "I wish I were an Oscar

    Mayer Wiener . . . ." *Id.* at 37:18-38:7.

5.  Plaintiff does not know who played the Oscar Mayer Wiener song on March 21, 2020. *Id.* at

    145:14-145:18.

6.  Other than calling him "Hot Dog" on March 21, 2020, and allowing the Oscar Mayer Wiener

    song to be played that day, Mr. Checketts never did anything Plaintiff believed to

    be improper. *Id.* at 31:3-31:17.

---

[2]     In his Opposition Memorandum, Plaintiff has relied on unauthenticated documents,
which cannot be considered for purposes of summary judgment. *See, e.g.*, *Jarrett v.
Spring/United Mgt. Co.*, 203 F.3d 835 (10th Cir. 2000); *Ford v. Jalisco Mkt, LLC*,
2:16CV619, 2017 WL 6060622, at *2 (D. Utah Dec. 6, 2017). Even if the court considered
these unauthenticated documents, though, the result would not change.

7. Plaintiff admits that he had the nickname "Hot Dog" going back as far as 2012. *Id*. at 41:10-42:6; *see also* Compl. (ECF No. 2 at ¶ 32) ("While employed at Nucor, employees repeatedly called Mr. Jensen 'Hot Dog' in reference to Mr. Jensen's rolls on the back of his neck.").

8. In February 2019, Plaintiff had submitted a grievance related to some prior discipline with which he disagreed. He noted in the grievance the "Hot Dog" nickname, and he wrote, in part, the following: "Early in my career as a supervisor I was given the name 'Hot Dog.' This was given to me because of the fat rolls on the back of my neck." Pl's Dep., ECF No. 39-1, Ex. 1, at 76:3-84:15.

9. According to Plaintiff, nicknames were common at that facility. *Id*. at 61:2-61:4.

10.  Until March 21, 2020, the date on which Plaintiff says Mr. Checketts called him "Hot Dog," Plaintiff does not recall anyone referring to him as "Hot Dog" since at least May 2017. *Id*. at 56:8-59:11 and 85:16-89:8.

11.  Until March 21, 2020, Plaintiff does not recall having heard the Oscar Mayer Wiener song played since at least October 2018. Plaintiff believes that he heard it played 2-3 times between September 2017 and October 2018, but he thinks that he had not heard it before then since at least May 2017. Plaintiff does not know of any specific person who ever played the Oscar Mayer Wiener song. *Id*. at 56:8-59:11, 85:16-89:8 and 145:14-145:18.

12. On each occasion prior to March 21, 2020, when Plaintiff was called "Hot Dog" and/or when the Oscar Mayer Wiener song was played, Plaintiff believed that it was related only to the

rolls on the back of his neck and did not believe it had anything to do with his penis. *Id*. at

84:5-84:25.[3]

13. At some point after February 2019, Plaintiff came to believe that the "Hot Dog" nickname

was given to him also to suggest he had a small penis. *Id*. at 43:4-45:16, 56:8-59:11, 76:3-

77:8 and 84:5-89:8.

14. According to Plaintiff, he came to believe the nickname "Hot Dog" was given to him also to

suggest he had a small penis because he performed a Google search of the question, "Why

would someone call me Hot Dog?," and the search result yielded a reference to a small

penis. *Id*. at 43:4-45:16 and 84:16-85:7.

15. Plaintiff admits that he only ever told people that he thought the nickname "Hot Dog"

related to the rolls on the back of his neck; he never told anyone he thought it was meant to

refer to a small penis. *Id*. at 45:4-45:16.

16. On April 8, 2020, Plaintiff's Supervisor, Mr. Montgomery, presented Plaintiff with discipline

related to his mistake on March 21, 2020. According to Plaintiff, after being presented with

---

[3] Plaintiff claims that this statement "misconstrues Mr. Jensen's testimony" because he also
testified later in his deposition that he came to understand that the nickname "hotdog" and
the playing of the Oscar Meyer Wiener song was in direct reference to his penis "sometime
around 2015, '16, '17, right in there." *Id*. at 152:19-153:14. But given Plaintiff's internally
inconsistent deposition testimony, along with (a) the fact that he admits he never told anyone
that he believed these references pertained to his penis; (b) his specific statement in his 2019
grievance that these references pertained to the rolls on the back of his neck, and (c) his
failure to provide any evidence to suggest that anyone else at Nucor thought the "hotdog"
reference referred to his penis, the court finds that the timing of when Plaintiff's belief arose
is not genuinely disputed nor is it relevant to the court's determination.

the discipline, Plaintiff told Mr. Montgomery that he "didn't appreciate Zane [Checketts] calling [him] Hot Dog, and [he] didn't appreciate the Oscar Mayer Wiener song being played on the radio when [he] was in a mess trying to fix [his] mistake." *Id*. at 46:7-46:21 and 48:2-50:1.

17. Jake Montgomery asked, "Why do they call you Hot Dog?" Plaintiff explained that he thought it was because he has a small penis. *Id*. at 48:17-48:25 and 49:2-49:11.

18. Plaintiff admits that during this conversation, he did not tell Jake Montgomery anything about the fact that he had had the nickname "Hot Dog" going back many years or that it related to the rolls on the back of his neck, as he did not think that was important to mention. *Id*. at 49:15-50:1.

19. According to Plaintiff, prior to his April 8, 2020, conversation with Mr. Montgomery, Plaintiff had not told anyone that Mr. Checketts had referred to him as "Hot Dog" and/or that the Oscar Mayer Wiener song was played on March 21, 2020. *Id*. at 46:7-46:21 and 48:2-48:12.

20. During the conversation with Mr. Montgomery, Mr. Montgomery asked Plaintiff if he had told Wayne Keller about it. Plaintiff had not talked to Mr. Keller about it, so Plaintiff called Mr. Keller, who was Mr. Checketts' boss. Mr. Montgomery was still with Plaintiff and was able to hear Plaintiff's side of the conversation. *Id*. at 49:12-50:9 and 63:21-65:8.

21. Plaintiff began the conversation with Mr. Keller on April 8, 2020, by attempting to explain the mistake he had made on March 21, 2020. Plaintiff then told Mr. Keller that he "didn't appreciate Zane [Checketts] calling him "Hot Dog" and his team playing the Oscar Meyer

Wiener song on the radio." [4] Plaintiff asked Mr. Keller, "In a situation like that, why are we talking about my penis?" *Id*. at 50:11-51:2; 54:5-54:23; Keller Dec., ECF No. 32-1, Ex. 2, p. 91 of 145, at ¶¶ 3, 4 and 6; Keller Stmt., ECF No. 32-1, Ex. 3, p. 94 of 145 (authenticated at Keller Dec., ECF No. 32-1, Ex. 2, p. 92 of 145, at ¶ 11); and Montgomery Stmt., ECF No. 32-1, Ex. 4, p. 95 of 145 (authenticated at Montgomery Dec., ECF No. 32-1, Ex. 5, p. 97 of 14, at ¶ 7).

22. During his deposition, Plaintiff admitted that Mr. Checketts never used the word "penis" over the radio. Pl.'s Dep., ECF No. 39-1, Ex. 1, at 51:22-24.

23. During his deposition, Plaintiff admitted that Mr. Checketts did not refer to Plaintiff's anatomy using any term. *Id*. at 31:3-31:17.

24. During his deposition, Plaintiff admitted that the only thing Mr. Checketts ever did that Plaintiff felt was improper was calling him "Hot Dog" on March 21, 2020, and allowing the Oscar Mayer Wiener song to be played on March 21, 2020. *Id.* at 31:3-31:17.

25. After Plaintiff's telephone call with Mr. Keller, Mr. Keller informed Nucor Human Resources Supervisor Cody McDermott that Plaintiff had made allegations that Mr. Checketts had referred to Mr. Jensen's penis size over the radio. On the same day, Mr. McDermott met

---

[4] It is unclear whether Plaintiff reported to Mr. Keller that Mr. Checketts had called Plaintiff "Hot Dog" or whether Plaintiff characterized Mr. Checketts' comment as referring to Plaintiff's penis size  Mr. Keller states that Mr. Jensen did not mention "Hot Dog" and said only that Mr. Checketts had made a comment about his penis size over the radio. Mr. Montgomery also testified that Mr. Jensen complained that Mr. Checketts had made fun of Mr. Jensen's penis size over the radio. Whether Mr. Jensen reported to Mr. Keller that Mr. Checketts called Plaintiff "Hot Dog" or whether he phrased it another way, it is undisputed that that both Mr. Montgomery and Mr. Keller understood Plaintiff to have complained that Mr. Checketts had referred to Plaintiff's penis size over the radio.

with Plaintiff and Mr. Montgomery. Mr. Keller told Mr. McDermott that he had talked to

Mr. Checketts, and Mr. Checketts denied the allegation. Both Mr. Keller and Mr.

Montgomery supplied their written statements to Mr. McDermott. *Id*. at 65:14-66:24; *see*

*also* McDermott April 8 Notes, ECF No. 32-1, Ex. 6 (authenticated in McDermott Dec., ECF

No. 32-1, Ex. 7, at ¶ 9); Keller Dec., ECF No. 32-1, Ex. 2, at ¶¶ 8-11; Montgomery Dec. ECF

No. 32-1, Ex. 5, at ¶¶ 7-8.

26. When Mr. McDermott asked Plaintiff questions about what had happened, Plaintiff

responded by saying that he did not want to get Mr. Checketts in trouble and that he

wanted Mr. Keller to handle the situation. When Mr. McDermott continued to ask Plaintiff

questions, he responded by saying, "I don't recall." Plaintiff never told Mr. McDermott that

Mr. Checketts had commented on his penis. *See* Pl.'s Dep., ECF No. 39-1, Ex. 1, at 65:14-

66:16; *see also* McDermott April 8 Notes ECF No. 32-1, Ex. 6 (authenticated in McDermott

Dec., ECF No. 32-1, Ex. 7, at ¶ 9).

27. Plaintiff admits that he refused to participate in Nucor's investigation. *See* Pl.'s Dep., ECF No

32-9, Ex. 1, at 66:22-66:24.

28. General Manager Chris Locke and Controller Chris Hendricksen met with Plaintiff later that

same day, April 8, 2020, in an effort to obtain more information given Plaintiff's

unwillingness to share information with Mr. McDermott. *See id*. at 70:24-71:14; Decl. of

Chris Locke, ECF No. 32-1, Ex. 8, at ¶¶ 4-5.

29. Plaintiff admits that he refused to answer certain questions when he met with Mr. Locke

and Mr. Hendricksen, and Plaintiff did not tell Mr. Locke and/or Mr. Hendricksen that

Mr. Checketts had commented on his penis. *See* Pl.'s Depo., ECF No. 39-1, Ex. 1, at 70:24-71:14; Locke Dec., ECF No. 32-1, Ex. 8, at ¶ 6; Hendricksen Dec., ECF No. 32-1, Ex. 12, at ¶ 6.

30. In the course of the investigation, Mr. McDermott questioned Mr. Checketts about Plaintiff's allegations and received from Mr. Checketts written statements. Mr. Checketts denied talking about Plaintiff's penis and denied any knowledge of the Oscar Mayer Wiener song having been played. See McDermott Dec., ECF No. 32-1, Ex. 7, at ¶ 10; *see also* Decl. of Zane Checketts, ECF No. 32-1, Ex. 9, at ¶¶ 5-11; Checketts Stmt., ECF No. 32-1, Ex. 10, (authenticated in Checketts Dec., ECF No. 32-1, Ex. 9, at ¶¶ 10-11).

31. Mr. Checketts reported to Mr. McDermott that, on one occasion (not on March 21, 2020), he heard Plaintiff ask Brian Henderson to give him a neck massage, and that he had responded by saying, "be careful, you might get 'Hot Dog' fingers." *See* Checketts Dec., ECF No. 32-1, Ex 9, at ¶ 8; McDermott Dec., ECF No. 32-1, Ex. 7, at ¶ 11.

32. Mr. Checketts knew Plaintiff had the nickname of "Hot Dog" because of the rolls on the back of his neck that looked like hot dogs. *See* Checketts Dec., ECF No. 32-1, Ex. 9, at ¶ 9.

33. Between April 9 and April 14, 2020, management of Nucor interviewed each team member on Mr. Checketts' crew who could have overheard the alleged March 21, 2020, comment about Plaintiff's penis and/or the Oscar Mayer Wiener song being played, including Spencer Johnson, Skyler Atkinson, Chase Jenson, Jim Shepard, Kurt Fullmer, Taylor Broadus, Sam Kearl, Andrew Johnson, Dayne Corbridge, Brad Wardle, and Lance Purser. During his deposition, Plaintiff recalled that Brad Wardle was working the March 21, 2020, shift, and Plaintiff believed that Spencer Johnson and crane operator "Sam" may also have been

working. Mr. Wardle, Mr. Johnson, and Sam Kearl are among the individuals who were

interviewed by Nucor Management. *See* Pl.'s Dep., ECF No. 39-1, Ex. 1, at 32:20-33:18; Crew

Notes, ECF No. 32-1, Ex. 11 (authenticated at McDermott Dec., ECF No. 32-1, Ex. 7, at ¶ 14).

34.  In interviewing the members of Mr. Checketts' crew, management inquired about whether

anyone had heard a statement over the radio regarding someone's penis and/or if they had

heard the Oscar Mayer Wiener song played over the radio in the last few months. Every one

of the eleven individuals interviewed denied having heard any comment about someone's

penis. A few of the individuals reported that they had heard the Oscar Mayer Wiener song

played in the past but said they had not heard it recently. *See* Crew Notes, ECF No. 32-1, Ex.

11 (authenticated at McDermott Dec., ECF No. 32-1, Ex. 7, at ¶ 14); McDermott Dec., ECF

No. 32-1, Ex. 7, at ¶¶ 12-13.

35.  Based on the investigation, Mr. Locke, Mr. Hendricksen, Mr. McDermott, and Melt Shop

Manager Jamie Wambsganss believed that Plaintiff had made an untrue allegation about

Mr. Checketts by reporting that Mr. Checketts had commented about Plaintiff's penis size

over the radio. *See* Locke Dec., ECF No. 32-1, Ex. 8, at ¶ 7; McDermott Dec., ECF No. 32-1,

Ex. 7, at ¶ 16; Hendricksen Dec., ECF No. 32-1, Ex. 12, at ¶ 7; Wambsganss Dec., ECF No. 32-

1, Ex. 14, at ¶ 8.

36.  Mr. Locke perceived that Plaintiff had difficulty accepting responsibility for his actions, and

often attempted to deflect when held accountable. *See* Locke Dec., ECF No. 32-1, Ex. 8, at ¶

9.

37. Plaintiff had gone to Mr. Locke on a number of occasions, trying to explain and justify his past performance issues. *See* Pl.'s Dep., ECF No. 39-1, Ex. 1, at 129:2-131:18; *see also* Locke Dec., ECF No. 32-1, Ex. 8, at ¶ 10.

38. Plaintiff admits that every time he sat down with Mr. Locke, Plaintiff brought up how unfair it was that he had been disciplined for certain things in the past. See Pl.'s Dep., ECF No. 39-1, Ex. 1, at 129:2-131:18; *see also* Locke Dec., ECF No. 32-1, Ex. 8, at ¶¶ 11-12.

39. Specifically, Plaintiff took issue with a March 2017 counseling he received regarding his leadership skills, his May 2017 demotion from the position of Role Mill Supervisor, and his removal from the Interim Safety Manager position in October 2018. He submitted grievances in February 2019 (one to two years after the events in question took place) about all these things and continued to complain about them after Mr. Locke arrived as the General Manager in May 2019 and throughout the rest of Plaintiff's employment. *See* Pl.'s Dep., ECF No. 39-1, Ex. 1, at 76:3-77:8, 80:1-83:3, 89:9-93:21, 94:8-95:18; *see also* Locke Dec., ECF No. 32-1, Ex. 8, at ¶¶ 11-12.

40. Regarding Plaintiff's March 2017 counseling about his leadership skills, Plaintiff found the counseling to be baseless and inaccurate. In Plaintiff's deposition, he testified that the counseling was initially incorrect as written because it said only that he had told an employee to "shut up" when he had actually told the employee, "Shut up, you're not helping." According to Plaintiff, by saying "Shut up, you're not helping," Plaintiff "more so asked him rather than told him" to shut up, so it was incorrect for the counseling to say he had told the employee to shut up. Plaintiff believed that Joey Loosle, who issued the March

2017 counseling, had it out for him because Mr. Loosle did not believe Plaintiff deserved to be a supervisor given Plaintiff had not gone through the steps one typically goes through to become a supervisor, and was instead what Plaintiff calls a "nontraditional supervisor." *See* Pl.'s Dep., ECF 39-1, Ex. 1, at 80:1-83:11 and 100:16-101:10.

41. Regarding his May 2017 demotion, Plaintiff thought that the demotion was unfair because he believed the individuals who made the decision—Nathan Marshall and Royce Harris— demoted him because they too disliked that Plaintiff was a "nontraditional supervisor." *See id*. at 56:2-56:14, 89:9-93:21 and 100:1-101:25.

42. Regarding his October 2018 removal from the interim safety manager position, Plaintiff admits that decision-makers Scott Laurenti and Dan Needham told him that he was being removed from the interim safety manager role because he could not get over the fact that he had previously been demoted from the Roll Mill Supervisor position. But Plaintiff believed it was more related to the fact that he pointed out that Royce Harris was on video in a pinch point. He does not believe anything else motivated them. *See id*. at 94:8-95:18 and 102:1-104:22.

43. Plaintiff continued in 2020 to raise objections about the March 2017 discipline regarding his leadership skills, his May 2017 demotion from the position of Roll Mill Supervisor, and his September 2018 removal from the interim safety manager role. *See* Locke Dec., ECF No. 32-1, Ex. 8, at ¶¶ 11-12; McDermott Dec., ECF No. 32-1, Ex 7, at ¶¶ 20-21.

44. Mr. Locke's perception, based on the numerous meetings he had with Plaintiff, his review of documents related to Plaintiff's employment history, and his conversations with others

(including individuals who had previously served in leadership roles at the facility and a coach who had been arranged to help Plaintiff learn leadership skills to succeed), was that Plaintiff failed to follow up when provided with constructive advice, and instead reverted to questioning the validity of management's past decisions. Mr. Locke shared this feedback with Plaintiff during a February 2020. *See* Locke Dec., ECF No. 32-1, Ex. 8, at ¶ 13.

45. Mr. Locke repeatedly, including during his February 2020 meeting with Plaintiff, talked with Plaintiff about the need for Plaintiff to look forward rather than backward. *See* id., at ¶ 14; Pl.'s Dep., ECF No. 39-1, Ex. 1, at 129:2-131:18.

46. Mr. Locke felt that Plaintiff was unwilling or unable to look forward rather than backward, creating negativity and evidencing an attitude that was not conducive to a successful future. Mr. Locke found Plaintiff's behavior and performance in this regard to be unsatisfactory. *See* Locke Dec., ECF No. 32-1, Ex. 8, at ¶ 15.

47. Due to the seriousness of what management viewed as Plaintiff's false report of harassment, and considering what management viewed as habitual unsatisfactory behavior and performance by Plaintiff, Mr. Locke, in conjunction with Mr. Hendricksen, Mr. McDermott, and Mr. Wambsganss, decided to terminate Plaintiff's employment, effective April 14, 2020. *See* Locke Dec., ECF No. 32-1, Ex. 8, at ¶ 16; McDermott Dec., ECF No. 32-1, Ex. 7, at ¶ 22; Hendricksen Dec., ECF No. 32-1, Ex. 12, at ¶ 7; and Wambsganss Dec., ECF No. 32-1, Ex. 14, at ¶ 9.

51. Plaintiff had no contract for a term of employment. *See* McDermott Dec., ECF No. 32-1, Ex. 7, at ¶ 23.

17

52. The Nucor handbook in place at the time of Plaintiff's termination from employment

included the following excerpts:

> This handbook is not a contract of employment. The policies, procedures, practices, and benefits described in the most current dated handbook supersede any earlier versions of our policies, including any prior handbooks. Nothing contained in this handbook or in any other statement of Company philosophy, including statements made in the course of performance evaluations and wage reviews, should be taken as constituting an express or implied promise of continued employment. The Company, like the employee, is free to terminate the employment relationship at any time for any lawful reason, as we are an "at will" employer. It is also important to note no one has the authority to enter into an oral employment contract on behalf of the Company and only the General Manager can enter into a written employment contract.

Handbook excerpts, ECF No. 32-1, Ex. 13 (authenticated at McDermott Dec., ECF No. 32-1, Ex. 7, at ¶ 24).

53. The handbook in place at the time of Plaintiff's employment termination also included the following excerpts:

> Nucor is committed to preventing discrimination and harassment in all aspects of our business. However, Nucor is unable to respond to a teammate's concern about discrimination or harassment if it is unaware such conduct has occurred or is occurring. Therefore, if you believe that you or another teammate are being discriminated against or harassed in any way by another teammate, by a supervisor or manager, by a customer, or by anyone with whom you come into contact during your work, it is your obligation to report these actions immediately.

*See id*.

**DISCUSSION**

I.     **Plaintiff's Title VII Sexual Harassment Claim[5]**

Hostile work environment sexual harassment arises when sexual conduct in the workplace "has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986) (citing 29 CFR § 1604.11(a)(3)). To be actionable, it must be sufficiently severe or pervasive, from both a subjective and an objective standpoint, "to alter the conditions of [the victim's] employment and create an abusive working environment." *Id*. Thus, to establish a prima facie case of hostile work environment sexual harassment, Plaintiff must show that: (1) he is a member of a protected group; (2) he was subject to unwelcome harassment; (3) the harassment was based on sex; and (4) the harassment was both objectively and subjectively so severe or pervasive that it altered a term, condition, or privilege of the plaintiff's employment and created an abusive working environment. *Dick v. Phone Directories Co.*, 397 F.3d 1256, 1262-63 (10th Cir. 2005) (citing *Seymore v. Shawver & Sons, Inc.*, 111 F.3d 794, 797-98 (10th Cir. 1997)). If any one of these elements is missing, the claim must fail. *See id*. In this case, Plaintiff has failed to present evidence sufficient to create a triable issue as to the third and fourth elements.

_____

[5] In his Opposition Memorandum, Plaintiff claims that he has pleaded a Title VII disparate treatment claim (in addition to his hostile work environment claim). Not only did he fail to plead a disparate treatment claim in his Complaint, but he has failed to identify facts supporting the elements of such a claim. Specifically, he has not identified any similarly situated employees who were treated more favorably in comparison, and he has also failed to cite to any evidence that creates a triable issue as to Nucor's motivation for terminating his employment.

### A.     Plaintiff Has Not Created a Genuine Issue of Material Fact as to Whether He Was Subjected to Harassment Based on His Sex

Plaintiff has not created a triable issue as to the third element of a hostile work environment claim because he has presented no evidence that he was subjected to unwelcome harassment that was based on sex. The United States Supreme Court has made it clear that it has "never held that workplace harassment . . . is automatically discrimination because of sex merely because the words used have sexual content or connotations*." Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80 (1998). The *Oncale* Court explained that "[w]hatever evidentiary route the plaintiff chooses to follow, he or she must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted "*discrimina[tion]* . . . because of . . .  sex." *Id*. at 81; s*ee also Vasquez v. Trinity Mission Health*, 2:11-CV-01002-EJF, 2013 WL 4095157, at *12 (D. Utah Aug. 13, 2013) ("[t]he plaintiff must produce evidence that [he] was the object of harassment because of [his] gender") (citing *Chavez v. New Mexico*, 397 F.3d 826, 832–33 (10th Cir.2005)) (emphasis in original).

In the instant case, according to Plaintiff, the only offensive thing Mr. Checketts ever did was call Plaintiff "Hot Dog" and allow the Oscar Mayer Wiener song to be played over the facility radio, each on one occasion. Thus, he has not created a genuine issue of material fact regarding whether Mr. Checketts' conduct had anything to do with Plaintiff's gender. By Plaintiff's own admission at his deposition (and despite what Plaintiff had previously told Nucor supervisor Wayne Keller), Mr. Checketts never said the word "penis" or otherwise referred to Plaintiff's anatomy. Given Plaintiff's admissions in this regard, to find that Plaintiff was harassed

on the basis of sex would necessarily require a finding that the nickname "Hot Dog" was based on sex, and such a finding would be both subjectively and objectively unreasonable.

Plaintiff admits that he had been given the nickname "Hot Dog" in 2012 or before, due to the rolls on the back of his neck, and that on every occasion when he was called "Hot Dog" prior to March 21, 2020, he believed the nickname related only to the rolls on the back of his neck. Plaintiff also admits that he never told anyone anything other than that he thought the nickname "Hot Dog" related to the rolls on the back of his neck.

Nonetheless, Plaintiff claims to have unilaterally come to understand at some point prior to making his April 8, 2020, complaint about Mr. Checketts that the "Hot Dog" nickname was intended also to suggest he had a small penis. According to Plaintiff, he came to this understanding after he performed a Google search of the question, "Why would someone call me Hot Dog?," and the search result yielded reference to a small penis. Other than Plaintiff's own conclusory allegations, there is no evidence in the record to suggest the nickname "Hot Dog" and/or playing the Oscar Mayer Wiener song had anything to do with Plaintiff's sex. *See*, *e.g.*, *Burns v. Granite Sch. Dist*., No. 2:10-CV-179-DAK, 2011 WL 4901318, at *10 (D. Utah, Oct. 14, 2011) (holding that supervisor's comments about male employees' tight pants and the length of plaintiff's toes were not "sexual in nature" where only plaintiff's belief of "where the comment was going" made them sexual in nature). Plaintiff's unsupported, conclusory, and self-serving allegations that he believed the nickname and song relate to his sex are not enough to create a triable issue of fact.

Plaintiff has not created a triable fact as to whether he suffered a hostile work environment as a result of his gender. Therefore, even if the record demonstrated that the alleged conduct about which Plaintiff complains actually occurred, it would not constitute an actionable hostile work environment because it was not based on Plaintiff's gender. Thus, Nucor is entitled to summary judgment on Plaintiff's sexual harassment claim.

### B.    The Alleged Conduct Was Not Sufficiently Severe or Pervasive to Alter the Conditions of Plaintiff's Employment

Even if Plaintiff could create a triable issue as to whether he was subjected to harassment based on his sex, his claim would fail at the "severe or pervasive" prong. To survive summary judgment, Plaintiff must also create a triable issue on whether the harassment was so severe or pervasive—both objectively and subjectively—to alter the conditions of his employment).  *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986).  In considering whether conduct is severe or pervasive, courts look to "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Lockard v. Pizza Hut, Inc.*, 162 F.3d 1062, 1071-72 (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993)). The United States Supreme Court "ha[s] made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment." *Id*. at 1072 (quoting *Harris*, 510 U.S. at 23).

Indeed, these standards are "sufficiently demanding" to ensure that they "filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of

abusive language, gender-related jokes, and occasional teasing." *Id.* "Run-of-the-mill boorish,

juvenile, or annoying behavior that is not uncommon in American workplaces is not the stuff of

a Title VII hostile work environment claim. *Morris v. City of Colo. Springs*, 666 F.3d 654, 664

(10th Cir. 2012).

In this case, Plaintiff's allegations are neither severe nor pervasive, let alone severe or

pervasive enough to alter the terms or conditions of Plaintiff's employment. Even taking

Plaintiff's allegations as true for purposes of summary judgment, the only occasion within the

statute of limitations in which the nickname "Hot Dog" was used or the Oscar Mayer Wiener

song was played took place on March 21, 2020. Prior to that, the last time Plaintiff claims the

nickname "Hot Dog" was used was before May of 2017, and the last time the Oscar Mayer

Wiener song was played was between September 2017 and October 2018 (and only 2-3 times

then). On each occasion prior to March 21, 2020, when Plaintiff was called "Hot Dog" and/or

the Oscar Mayer Wiener song was played, Plaintiff believed it was related only to the rolls on

the back of his neck and did not believe it had anything to do with his penis size.

Allegations related to conduct occurring prior to the statute of limitations are time-

barred unless they can be saved by the continuing-violation doctrine, which does not apply

here. "[A] series of alleged events comprises the same hostile environment [for purposes of

applying the continuing-violation doctrine] where 'the pre- and post-limitations period

incidents involve[d] the same type of employment actions, occurred relatively frequently, and

were perpetrated by the same managers.'" *Johnson v. City of Murray*, 909 F. Supp. 2d 1265,

1285 (D. Utah 2012), *aff'd*, 544 Fed. App'x. 801 (10th Cir. 2013) (unpublished) (quoting *Natl. R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 120 (2002)).

Here, there is no evidence suggesting that the pre- and post-limitations allegations "occurred relatively frequently" or that they were perpetrated by the same individuals. Indeed, Plaintiff alleges that the only allegations involving Mr. Checketts occurred on March 21, 2020. Because Plaintiff's Charge of Discrimination was filed on October 6, 2020, the allegations about conduct from years earlier by individuals other than Mr. Checketts do not factor into the court's analysis, and the only allegation at issue occurred on March 21, 2020. *Boyer v. Cordant Techs., Inc.*, 316 F.3d 1137, 1138 (10th Cir. 2003) (Title VII plaintiff must file a charge of discrimination within 300 days of the alleged unlawful discriminatory practice).

Furthermore, it is not enough that Plaintiff alleges that he found the conduct subjectively severe or pervasive. Rather, Plaintiff must establish that the alleged incidents were so severe or pervasive that a reasonable person would find that they would alter the terms or conditions of employment. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998); *Morris v. City of Colo. Springs*, 666 F.3d 654, 666 (10th Cir. 2012) ("A plaintiff does not make a sufficient showing of a pervasively hostile work environment by demonstrating a few isolated incidents of . . . sporadic . . . slurs . . . . Instead, there must be a steady barrage of opprobrious . . . comments.") (internal quotations and citations omitted)). There are no such facts in the record, and no reasonable juror would believe that the events that are alleged to have taken place on March 21, 2020, were sufficiently severe or pervasive to alter the conditions of Plaintiff's employment.

Indeed, courts within the Tenth Circuit routinely decline to find a hostile work environment based on harassment far more frequent and more hostile than the allegations lodged by Plaintiff. *See, e.g., Pascouau v. Martin Marietta Corp.*, 185 F.3d 874 (10th Cir. 1999) (upholding district court decision concluding that "nicknames like 'bumper' and 'bullets'- names that ostensibly refer to [plaintiff's] breast size" did not create a sexually harassing hostile work environment); *Ebert v. Lamar Truck Plaza*, 715 F. Supp. 1496, 1499 (D.Colo.1987), *aff'd*, 878 F.2d 338 (10th Cir.1989) (affirming grant of summary judgment for the employer despite evidence that employee was exposed to vulgarities, offensive gesturing and touching, and later discharged); *Sprague v. Thorn Americas, Inc.*, 129 F.3d 1355, 1365–66 (10th Cir.1997) (upholding summary judgment for the employer where plaintiff provided evidence of five separate incidents of sexist comments or actions by a coworker who became her supervisor, over sixteen months); *Gaff v. St. Mary's Reg'l Med. Ctr.*, 506 Fed. App'x 726, 727–29 (10th Cir.2012) (upholding summary judgment for employer where co-worker commented that plaintiff's husband was going to leave her for another woman, was "a little too friendly and smiled and stared at her a little too much," and told her she needed a "good f[——]"); *Oliver v. Peter Kiewit & Sons/Guernsey Stone*, 106 Fed. App'x. 672 (10th Cir. 2004) (unpublished) (holding that male co-workers and supervisors use of "offensive language" and making "graphic jokes" did not subject the plaintiff "to severe or pervasive harassing behavior"); *Kirk v. City of Tulsa, Ok.* 72 Fed. App'x. 747 (10th Cir. 2003) (unpublished) (affirming summary judgment because, even though the plaintiff alleged eight incidents, two of which contained "sexually offensive remarks about women, of which one was directed at [the p]laintiff, although made in

her absence," and even though the male co-worker's "behavior is reprehensible, the correction of indiscriminate boorishness and vulgarity in the workplace is not the function of a Title VII action for a sexually hostile environment"); *Prentice v. Univ. of Tulsa*, 50 Fed. App'x. at 896 (agreeing with district court that the plaintiff's allegation of four incidents—which included her supervisor's statement that the plaintiff needed to "sleep" with a department director to get additional staff and her supervisor's threat to harm her and her family after she told him of her intent to file a grievance—"did not present evidence sufficient to raise genuine issues of material fact regarding sexual discrimination or a gender-based hostile work environment.")

At worst, Plaintiff's allegations consist of an "isolated incident that cannot remotely be considered extremely serious," as required to constitute a Title VII violation. *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 271-72 (2000) (internal quotations omitted) (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) ("[I]solated incidents (unless extremely serious) will not amount to" a hostile work environment)). Any such allegations do not give rise to a workplace that was "permeated with discriminatory intimidation, ridicule, and insult" as required to establish a hostile work environment. *Kline v. Utah Anti–Discrimination & Labor Div.*, 418 Fed. App'x. 774, 781 (10th Cir.2011) (unpublished). Nor did Plaintiff face a physically threatening environment. Finally, there is no evidence that the alleged offensive utterances unreasonably interfered with Plaintiff's work performance.

Therefore, Plaintiff fails to identify any conduct sufficiently severe or pervasive to alter the terms or conditions of Plaintiff's employment—either subjectively or objectively, and thus, his hostile work environment claim fails on this independent ground.

**C. Faragher-Ellerth Affirmative Defense**

Even if Plaintiff could establish a prima facie case of sexual harassment, and even if the alleged conduct was severe or pervasive, Plaintiff's claim would still fail because Defendant is entitled to the *Faragher-Ellerth* defense. Under the *Faragher-Ellerth* framework, a defendant/employer may avoid liability or damages where (a) the defendant exercised reasonable care to prevent and correct promptly any sexually harassing behavior; and (b) the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by defendant or to otherwise avoid harm. *Faragher v. City of Boca Raton*, 524 U.S. 775, 807–08 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 764–65 (1998). [6] "An employer is absolved of liability for acts of harassment by its employees if it undertakes remedial and preventative action 'reasonably calculated to end the harassment.'" *Duncan v. Manager, Dept. of Safety, City & Cnty. of Denver*, 397 F.3d 1300, 1310 (10th Cir. 2005) (citation omitted). "If the employer's response ends the harassment by the employee in question, [courts] presume that the remedial action was sufficient." *Id.*

---

[6] The *Faragher-Ellerth* defense is not available when a supervisor with actual or apparent authority over the employee engages in harassment that culminates in a tangible employment action; however, "a plaintiff cannot show that a supervisor's harassment 'culminated' in a tangible employment action merely by demonstrating that the tangible employment action followed the harassment." *Helm v. Kansas*, 656 F.3d 1277, 1287 (10th Cir. 2011). Here, there is no dispute that Plaintiff's discharge constitutes a tangible employment action; however, he does not suggest that the sexual harassment is what caused his termination (as might be the case where a plaintiff claims that his/her refusal to engage in requested sex acts caused the termination). Rather, Plaintiff claims that his termination was in retaliation for making a report of harassment.

The first element of the defense imposes two distinct requirements on an employer: (1) the employer must have exercised reasonable care to prevent sexual harassment, and (2) the employer must have exercised reasonable care to correct promptly any sexual harassment that occurred. *Debord v. Mercy Health Sys. of Kan., Inc.*, 737 F.3d 642, 653 (10th Cir. 2013).  An employer acts reasonably as a matter of law to prevent harassment if it adopted valid sexual harassment policies and distributed those policies to employees via employee handbooks. *Id.* With respect to the correction element, the "most significant immediate measure an employer can take in response to a sexual harassment complaint is to launch a prompt investigation to determine whether the complaint is justified." *Id.* (internal quotation marks omitted) (citing *Helm v. Kansas*, 656 F.3d 1277, 1287 (10th Cir. 2011).

Defendant Nucor has an anti-harassment/anti-discrimination policy in place that is designed to prevent and correct any sexually harassing behavior. The applicable policy states, in part:

> Nucor is committed to preventing discrimination and harassment in all aspects of our business. However, Nucor is unable to respond to a teammate's concern about discrimination or harassment if it is unaware such conduct has occurred or is occurring. Therefore, if you believe that you or another teammate are being discriminated against or harassed in any way by another teammate, by a supervisor or manager, by a customer, or by anyone with whom you come into contact during your work, it is your obligation to report these actions immediately.

*Id.* Furthermore, when Nucor learned of Plaintiff's complaint regarding Mr. Checketts, it immediately launched an investigation. As Nucor attempted to promptly investigate the allegations, however, Plaintiff refused to cooperate and back-peddled on his previous allegations. Because Plaintiff refused to cooperate in the investigation, he unreasonably failed

to take advantage of any preventive or corrective opportunities provided by Nucor or to otherwise avoid harm. For these reasons, even if Plaintiff could state an actionable claim for relief, Nucor is entitled to summary judgment because it took prompt corrective action to address Plaintiff's allegations, and Plaintiff failed to take advantage of available corrective opportunities.

In Plaintiff's Opposition Memorandum, he attempts to argue that Nucor's stated reason for his termination was pretext: "[o]nly now, after the fact, does Defendant aver that Mr. Jensen made a false report" and that the stated reason for termination is "ex-post-facto.'" (*See* Mem. in Opp'n, ECF No 39, at 35). Plaintiff's own Complaint, however, specifically alleges that on the date of his termination, "Defendant terminated Mr. Jensen's employment for the sole reason that Mr. Jensen's report had, according to Defendant, been "false." (Compl., ECF No. 2, at ¶¶ 17-18) ("Defendant had performed an investigation and determined that Mr. Jensen had made a false allegation of sexual harassment that could have, said Defendant, cost another employee their job."); (*Id*. ¶ 27) ("Defendant presented Mr. Jensen with a termination notice for a "False Harassment" claim against another co-worker, and promptly escorted Mr. Jensen off the property.").

Moreover, the focus of the inquiry is not whether Plaintiff was being honest in his reporting but whether Nucor honestly believed the reasons for Plaintiff's termination and acted in good faith on those beliefs. Plaintiff has not presented any admissible evidence that contradicts the fact that the relevant decisionmakers had a good-faith belief that Plaintiff made a false statement when he reported that Mr. Checketts made comments about his penis size

over the radio. Plaintiff's own deposition testimony confirms that Mr. Checketts did not say anything about Plaintiff's penis at any time, and that Plaintiff never once told anyone that he believed the nickname "Hot Dog" related to his penis. Given that Plaintiff had complained in 2019 about use of the nickname "Hot Dog," informing Nucor that the nickname related to the rolls on the back of his neck, his history of not accepting responsibility for his own actions, and his refusal to cooperate with the investigation in April 2020, there was every reason for Nucor management to believe that Plaintiff had made a false allegation in an attempt to deflect blame from his poor performance history. Thus, even if Plaintiff had stated a claim for hostile work environment, he has not created a triable issue regarding pretext, and summary judgment is warranted because Nucor is entitled to the *Faragher-Ellerth* defense.

## II.      Plaintiff's Title VII Retaliation Claim

### A.      Plaintiff's Prima Facie Case of Retaliation Fails Because He Did Not Engage in Protected Activity.

Plaintiff cannot establish a prima facie case of retaliation because making a false allegation of sexual harassment does not constitute protected activity. *Villa v. CavaMezze Grill, LLC*, 858 F.3d 896, 901 (4th Cir. 2017) ("The opposition clause does not protect the making of a knowingly false allegation.") (citing *Richey v. City of Indep.*, 540 F.3d 779, 785 (8th Cir. 2008)); *EEOC v. Total Sys. Servs., Inc.*, 221 F.3d 1171, 1176 (11th Cir.  2000); *Wilson v. UT Health Ctr.*, 973 F.2d 1263, 1268 (5th Cir. 1992)). When Plaintiff made the complaint regarding the March 21, 2020, allegations, Plaintiff told Mr. Keller that Mr.

Checketts had made a comment about his penis size over the radio, and asked Mr. Keller

the question, "Why are we talking about my penis?"

Yet, when Nucor attempted to promptly investigate the allegations, Plaintiff

refused to cooperate with the investigation and back peddled on his previous allegations.

Contrary to his statements on April 8, 2020, Plaintiff also testified during his deposition

that Mr. Checketts never said anything about his penis. Accordingly, Plaintiff either

fabricated what Mr. Checketts said or communicated the incident in an unfortunate

manner, which was apparently influenced by what Plaintiff thought the nickname "Hot

Dog" might mean, informed by a mere Google search. Because false allegations are not

protected by the opposition clause, Plaintiff cannot establish a prima facie case of

retaliation.

Even if Plaintiff did not make a false report of harassment, he still cannot prove a

prima facie case of retaliation. To engage in protected opposition to discrimination

sufficient to prove the first element of a prima facie case of retaliation, a plaintiff must

have a reasonable, good-faith belief that he was opposing discrimination. *Crumpacker v.*

*Kansas Dept. of Human Res.*, 338 F.3d 1163, 1171 (10th Cir. 2003) (retaliation claim

cannot be grounded on unreasonable good-faith belief that underlying conduct violated

Title VII); *Zinn v. McKune*, 143 F.3d 1353, 1362 (10th Cir. 1998) (emphasis added));

*Petersen v. Utah Dept. of Corr.*, 301 F.3d 1182, 1188 (10th Cir. 2002) (opposition to an

employer's conduct is protected only if it is in opposition to "an unlawful employment

practice by [Title VII]." Title VII does not prohibit all distasteful practices by employers).

This "reasonable, good-faith belief" test has both subjective and objective components. *Clark v. Cache Valley Elec. Co.*, 573 Fed. Appx. 693, 700-02 (10th Cir. 2014). A plaintiff must show not only that he subjectively believed that his employer was engaged in unlawful employment practices, but also that his belief was objectively reasonable in light of the facts and record presented. *Id.* (internal citations omitted). To determine whether it was objectively reasonable for a person in Plaintiff's position to have believed that he was opposing prohibited conduct, the court must look to the underlying substantive law, which here, is sexual harassment. *Id.* (citing *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268 (2001)).

As discussed above, to state an actionable claim for sexual harassment under Title VII, the harassment must be based on sex, and must be "sufficiently severe or pervasive such that it altered the terms or conditions of [his] employment and created an abusive working environment." *Morris v. City of Colo. Springs*, 666 F.3d 654, 663 (10th Cir. 2012). It is not objectively reasonable for a person in Plaintiff's position to believe that he was legitimately opposing unlawful sexual harassment. Plaintiff's allegations boil down to a single, isolated incident on March 21, 2020, during which Mr. Checketts purportedly referred to him as "Hot Dog" and someone allegedly played the Oscar Mayer Wiener song over the radio. Although Plaintiff did complain about being called "Hot Dog" in February of 2019, he admits that he did not believe the nickname had anything to do with his penis at that time. Rather, as of February 2019, Plaintiff's understanding was that he was called "Hot Dog" because of the "rolls on the back of his neck." It was not until sometime after his February 2019 complaints that he unilaterally concluded that his long-standing

nickname was related to his penis. Furthermore, Plaintiff admitted that the March 21, 2020, reference to "Hot Dog" was the first time anyone used the term since at least May 2017, and that he had no prior conversations or interactions with Mr. Checketts that he found to be offensive or that made him uncomfortable.

Moreover, there is no dispute that Plaintiff reported the alleged harassment—all of which he claims occurred more than two weeks prior—immediately after he was issued a written discipline letter on April 8, 2020. Plaintiff's inconsistent statements, refusal to cooperate in the investigation, and his history of attempting to deflect from his own performance demonstrates that his "complaint" was not made in good faith. Thus, Plaintiff cannot carry his burden to establish a triable issue as to whether he engaged in protected activity.

### B.    Plaintiff Cannot Establish That Nucor's Non-Retaliatory Reason for His Termination Was Pretextual

Even if Plaintiff could establish a prima facie case of retaliation, he has not created a triable issue that Nucor's reason for his termination was pretextual. To establish a genuine issue as to pretext and avoid summary judgment, a plaintiff must demonstrate that the employer's proffered non-retaliatory reason is unworthy of belief. *Pinkerton v. Colorado Dept. of Transp.*, 563 F.3d 1052, 1065 (10th Cir. 2009). Despite the burden-shifting framework, "[t]he burden of proof to establish . . . retaliation 'remains at all times with the plaintiff.'" *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 986 (1988)). A plaintiff produces sufficient evidence of pretext when he shows "such weaknesses,

implausibilities, inconsistencies, incoherencies, or contradictions in the employer's

proffered legitimate reasons for its action that a reasonable factfinder could rationally

find them unworthy of credence and hence infer that the employer did not act for the

asserted non-discriminatory reasons." *Jones v. Okla. City Pub. Schs.*, 617 F.3d 1273, 1280

(10th Cir. 2010).

      In determining whether an employer's reasons were pretext, courts do not look at

"whether the employer's proffered reasons were wise, fair or correct, but whether the

employer honestly believed those reasons and acted in good faith upon those beliefs."

*Rivera v. City & Cnty. of Denver*, 365 F.3d 912, 924-925 (10th Cir. 2004) (citation omitted).

When evaluating the sufficiency the evidence, courts look to several factors, "includ[ing]

the strength of the [employee's] prima facie case, the probative value of the proof that

the employer's explanation is false, and any other evidence that supports the employer's

case and that properly may be considered on a motion for summary judgment. *Jones*, 617

F.3d at 1280 (internal quotations omitted).

      As addressed above, even though Plaintiff refused to cooperate with the

investigation, there is no dispute that Nucor continued its investigation in good faith.

Nucor interviewed the individuals who worked on Mr. Checkett's crew, inquiring about

whether any had heard a statement over the radio about someone's penis and/or if they

had heard the Oscar Mayer Wiener song played over the radio. Every one of the eleven

individuals interviewed denied having heard any comment about someone's penis. A few

of the individuals reported that they had heard the Oscar Mayer Wiener song played in

the past, but they said they had not heard it recently. Ultimately, Nucor management concluded that Mr. Checketts had not commented on Plaintiff's penis size over the radio, contrary to Plaintiff's report to Mr. Keller (in the presence of Supervisor Jake Montgomery). Further, they concluded that Plaintiff's report that Mr. Checketts had made such a comment was a false report. Nucor did not have to be correct in that conclusion. *See EEOC v. Total Sys. Servs., Inc.*, 221 F.3d 1171, 1176–77 (11th Cir. 2000) (citing *Elrod v. Sears*, *Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991) (holding that the employer was justified in terminating an employee based on a good-faith belief that the employee lied during an internal sexual harassment investigation, noting that the inquiry is not whether the employee was guilty of misconduct but whether the employer in good faith believed employee had done wrong and whether this belief was the reason for the termination).

In the instant case, Plaintiff has not created a triable issue as to whether the Nucor decisionmakers had a good-faith belief that Plaintiff made a false statement when he reported that Mr. Checketts commented on his penis size over the radio. And while Nucor's good-faith belief is enough, Plaintiff's own deposition testimony demonstrates that the company was, in fact, correct in that conclusion. In sum, Plaintiff cannot create a triable issue as to pretext, and therefore his retaliation claim fails for this additional reason.

**CONCLUSION**

For the foregoing reasons, Defendants' Motion for Summary Judgment is GRANTED, and

Plaintiff's Complaint is dismissed in its entirety.

DATED this 23rd day of May, 2023.

BY THE COURT:

DALE A. KIMBALL
United States District Judge